IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RICKY MOORE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:16-cv-1501 |
| | § | |
| CITY OF DALLAS, TEXAS; DAVID O. | § | |
| BROWN, in his official capacity as Chief of | § | |
| Police for the Dallas Police Department; | § | |
| LARRY D. LITTON, individually and in his | § | |
| official capacity as Sergeant for the Dallas | § | |
| Police Department; | § | |
| | § | |
| Defendants. | § | |

## VERIFIED COMPLAINT

Plaintiff Ricky Moore, by counsel, comes now and avers the following:

## INTRODUCTION

1.     This is a civil rights claim brought under 42 U.S.C. § 1983, challenging City of

Dallas policy, as enforced by Dallas Police Department, that empowers a private management

entity with the ability to regulate constitutionally-protected expression in a city-owned park, and,

in particular, adopts and enforces a private management park rule that imposes a permit

requirement and an exorbitant fee on religious expression taking place in open areas of Klyde

Warren Park, preventing Plaintiff Ricky Moore from using a small portable sketch board and

engaging others in friendly conversations to convey his religious beliefs in the traditional public

forum.

2.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff Ricky Moore seeks injunctive

relief, declaratory relief, and nominal damages against Defendants City of Dallas, Texas, David

COMPLAINT, page 1

O. Brown, in his official capacity as Chief of Police for the Dallas Police Department, and Larry

D. Litton, individually and in his official capacity as Sergeant for the Dallas Police Department.

3.      This action is premised on the United States Constitution concerning the

deprivation of Plaintiff Ricky Moore's fundamental rights to free speech and due process.

4.      Defendants' actions have deprived and will continue to deprive Plaintiff Ricky

Moore of his fundamental rights as set out in the First and Fourteenth Amendments to the United

States Constitution.

5.      Each and every act of Defendants alleged herein was committed by Defendants

named herein, and under the color of state law and authority.

## JURISDICTION AND VENUE

6.      This action raises federal questions under the First and Fourteenth Amendments

to the United States Constitution and 42 U.S.C. § 1983.

7.      This Court has original jurisdiction over the federal claims by operation of 28

U.S.C. §§ 1331 and 1343.

8.      This Court has authority to grant the requested injunctive relief under 28 U.S.C. §

1343, the requested declaratory relief under 28 U.S.C. §§ 2201-02, the requested damages under

28 U.S.C. § 1343, and the requested costs and attorney fees under 42 U.S.C. § 1988.

9.      Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(b)

because all Defendants reside in this district and all actions giving rise to this cause occurred in

this district.

## PARTIES

10.     Plaintiff Ricky Moore ("Moore") is and was at all relevant times a resident of

Cedar Hill, Texas.

11.     Defendant City of Dallas, Texas ("Dallas") is a municipal governmental authority, a subdivision of the State of Texas.

12.     Defendant David O. Brown ("Chief Brown") is sued in his official capacity as Chief of Police for the Dallas Police Department.  In his official capacity, Chief Brown is responsible for overseeing and implementing all policies affecting the enforcement of laws.

13.     Defendant Larry D. Litton ("Sgt. Litton") is sued individually and in his official capacity as Sergeant for the Dallas Police Department.  In his official capacity, Sgt. Litton is charged with enforcing applicable laws and Dallas Police Department policies.

## STATEMENT OF FACTS

### Moore's Message

14.     Moore is an evangelical Christian, whose love for others strongly motivates him to share his Christian beliefs with them.  To accomplish this goal, he routinely goes out in public places where people are found and shares his faith.

15.     Moore's basic message is that God loves everyone and Jesus died for their sins.

16.     To do this, Moore uses a portable sketch board, puts up a series of pictures and riddles, waits for interested passersby to notice and approach him, and then he discusses the meaning of the riddles with them, eventually leading to friendly, non-threatening conversations about his religious beliefs.

17.     The portable sketch board is part of a small wooden cabinet on wheels that holds small items, including Moore's paint, paper, and brushes.  The door to this compartment is on a vertical hinge, allowing it to flip up, then outward, creating a solid surface on which Moore

secures a piece of paper to put his riddles on.  When closed, the cabinet is approximately 2 feet in width, 2 feet in length, and 3.5 feet in height.  When the sketch board is fully erected, it is approximately 4 feet in width, 2 feet in length, and 6.5 feet in height.

18.     The riddles that Moore uses are word puzzles known as rebuses.  Typically, Moore's first rebus is the word "man," with a line underneath it, and the word "board" beneath that line.  The answer to this puzzle is "man overboard."

19.     When discussing the rebuses with someone, Moore gives clues to the solution through a story which Moore tells and illustrates about a man named Harvey who falls into a lake while fishing.  The story sets up the topic of life after death, giving Moore an opportunity to share his religious beliefs regarding this topic.

20.     This method is essential for Moore because it gives him an opportunity to share his message in an inviting, non-confrontational, and non-threatening way.

21.     Moore does not want to approach people, call out to people, or interrupt what they are doing.  He does not want to force people to pay attention to him.  For this reason, he puts up his riddles and puzzles and only speaks with those who approach and engage him in discussion.

22.     When using his portable sketch board, Moore uses water-based paints and typically puts out a piece of paper or mat as a drip guard.

23.     Moore usually conducts this expressive activity with one other person, but occasionally he does it alone.

24.     Moore does not solicit money, signatures, or membership to join an organization.

25.     Moore is careful to place his portable sketch board and himself in spots where he does not block pedestrian traffic or cause congestion.

26.     While discussing the rebuses on his sketch board, Moore does not attempt to share his message with a large crowd.  For his purposes, he only wishes to converse with one or two individuals at a time.

27.     Over the years, Moore has engaged in this form of expression in various public places throughout the city of Dallas.  Moore specifically wants to engage in his expressive conduct in Klyde Warren Park, on or in close vicinity to Hart Boulevard, a wide pedestrian walkway that flows through the center of the Great Lawn area of the park.  Moore prefers this location due to the unrivaled opportunity it offers for reaching many people with his message in a wide-open, well-travelled, and relaxed environment.

**Klyde Warren Park**

28.     Klyde Warren Park is a city-owned public park located in the center of Dallas, Texas, next to the downtown arts district.  The Woodall Rodgers Park Foundation is a private entity that manages Klyde Warren Park.

29.     Klyde Warren Park is approximately 5.2 acres, and is shaped like a rectangle, extending lengthwise diagonally from northeast to southwest.  It is bordered by opposing traffic lanes of the Woodall Rodgers Freeway on both the northwest and southeast, by North St. Paul Street on the southwest, and by North Pearl Street on the northeast.  Two additional lanes of the Woodall Rodgers Freeway run underneath the park.

30.     North Olive Street travels from northwest to southeast and bisects Klyde Warren Park into two primary sections: a northeastern section and a southwestern section.

31.     The northeastern section contains two grassy areas (the Pearl Lawn and the East Lawn), a dog park, and a games area.  Wide paved sidewalks traverse this section in a "X"

formation, separating these four areas.

32.     The Pearl Lawn lies on the northeastern-most side of the park, along North Pearl Street, and is an empty triangular grassy field.

33.     South of the Pearl Lawn, lying along the southeastern lane of the Woodall Rodgers Freeway is Klyde Warren's dog park, which is separated from the Pearl Lawn and surrounding park by a fence.

34.     To the southwest of the dog park and lying along North Olive Street is the East Lawn, which is another grassy field.

35.     North of the East Lawn and west of the Pearl Lawn is the games area, which contains ping pong tables, a petanque field, and other types of games.  It is separated from the Pearl and East Lawns by pathways and shrubbery.

36.     The southwestern section of Klyde Warren Park includes several attractions. From the western corner of the park along the northwestern border, there is a children's park with playgrounds and a reading area.  Continuing on this northwestern border there is a restaurant.  Just east of the restaurant, there sits a performance pavilion where various concerts and performances take place throughout the year.  East of the pavilion is a ground fountain where children play during the summer.  This section of the park also includes several walking paths, including "Jane's Lane," a wide granite pathway that extends along the southeastern border for the length of the park and includes many tables, chairs, and benches.

37.     The centerpiece of the southwestern section is the Ginsburg Family Great Lawn (Great Lawn), a wide-open grassy area that the public utilizes for various activities typical of a public park.  The Great Lawn is located in the center of this section.

38.     Hart Boulevard is a wide paved pedestrian walkway that serves as a primary entrance into and out of Klyde Warren Park.  Beginning at the intersection of North Harwood Street and the Woodall Rodgers Freeway, Hart Boulevard passes straight through the Great Lawn from northwest to southeast, and serves as a main conduit for pedestrian traffic across the park and to other parts of Dallas.  On each end of Hart Boulevard is an additional ground fountain.

39.     Food trucks regularly line up along the south side of Klyde Warren Park, attracting many visitors to the park, many of whom use Hart Boulevard to get there.

40.     More so than any other space in the park, the Great Lawn is well-used by the public and serves as the park's main attraction.

41.     As a public park, all of Klyde Warren Park, including the Great Lawn, is free and open to the public from 6 a.m. to 11 p.m. year-round.  There is no fence around the park.  There are no signs indicating that pedestrian access to the park is restricted in any way.

42.     There are only a handful of architectural barriers limiting pedestrian access to the park.  On the northwestern edge of the park's southwestern section, extending southwest from North Olive Street to North Harwood Street the restaurant's walls stand along the park's bordering sidewalk.  From there, after crossing Hart Boulevard, a concrete safety wall is located between the public sidewalk and an exit to the freeway beneath the park where vehicles exit onto St. Paul Street.  On the southeastern edge of the park's northeastern section, another concrete wall lies between the bordering sidewalk and the park, which extends for about one-third the length of this edge of the park.  Besides these and several instances of decorative shrubbery scattered along the park's borders, the public may enter the park from any direction without

limitation.

43. Klyde Warren Park's most conspicuous entrances include the corners of each section and each end of Hart Boulevard.

44. A few entrances to the park include permanent signs signifying "Klyde Warren Park." As one enters the area, there are no indicators suggesting the park is private property, a special enclave, or anything other than a city-owned public park.

45. The Woodall Rodgers Park Foundation maintains a number of rules regulating conduct taking place in the park. Several of these rules relate to "public events" which are defined as "any activity that is intended to attract an audience." These rules note that "For public events, we offer an area of the Park for no rental fee (usually the Pearl Lawn)." The rules continue: "A permit is required for a public event if you intend to: use another area of the Park; reserve an area of the Park at a particular time; affix anything to Park property; use a structure larger than 4' x 4' (not including table); sell or advertise a product or service; use amplified sound; have an activity that may damage Park property or pose harm to Park visitors; have 10 or more participants, not including the audience."

46. Most of the major park entrance points include one or two freestanding posts listing park rules.

47. One of the park's posted rules reads: "Reserving Space: Events, demonstrations, or gatherings of 10 or more require a permit from Klyde Warren Park."

48. Another posted park rule reads: "Commercial Activity: Commercial activity of any type, including photo/video shoots for commercial use and soliciting, is prohibited without a permit from Klyde Warren Park. Members of the news media are welcome to photograph or

COMPLAINT, page 8

videotape for news coverage."

49.    A third posted park rule reads: "The Following are Prohibited: Fireworks, firearms, or other weapons; Smoking/E-cigarettes; Panhandling; Soliciting; Excessive Noise; Camping; Open flame; Erecting tents or other structures; Driving stakes or poles into the ground; Barbecue grills; Feeding birds; Drug use; Glass containers; Outside Alcohol."

50.    Members of the public freely use Klyde Warren Park, and particularly the Great Lawn, for a variety of recreational activities, including walking, running, playing sports, kite-flying, dog-walking, conversing, picnicking, and more.  No permit or other restriction is placed on these activities.

**Moore Encounters Resistance from Park Management at Klyde Warren Park**

51.    Moore first started coming to Klyde Warren Park in early 2013.  Initially, he was able to engage in his expressive activity along Hart Boulevard without interference.  Moore was allowed to use his sketch board and peacefully share his faith with many people.

52.    Sometimes Moore set up his sketch board on Hart Boulevard, along its edge, while at other times he set it up on the grass of the Great Lawn right next to Hart Boulevard.  He always left plenty of room for pedestrians to walk by on the wide-open pathway.

53.    On one of Moore's visits in early 2013, he was approached by Celia Barshop, who at that time was the Vice President of Business Affairs for the Woodall Rodgers Park Foundation.  She asked Moore what he was doing and he explained that he was setting up his sketch board and planning to talk to others about God.  Barshop replied that she was glad to have him there, and left.  Moore was left alone to continue his expression.

54.    On April 13, 2013, while Moore was setting up his sketch board on the edge of

Hart Boulevard in the Great Lawn of the park, a park security guard approached him and told him that his expression was prohibited.  Moore explained to the guard that he thought he had a right to engage in his expression in a public park, but the guard disagreed.  Wanting to avoid a confrontation, Moore left the park.

55.     Over the next year or so, Moore occasionally went out with his sketch board in public places in the Dallas area, but none of the places he visited offered Moore the same audience he enjoyed at the Great Lawn in Klyde Warren Park.  Moore's interest in speaking at Great Lawn increased as he encountered these inferior venues for his message.  Unfortunately, for a short time, Moore had to cease his expression altogether due to health issues.  Despite these setbacks, Moore's steadfast belief that he should have the right to speak in a public park never waned.

56.     So, as he started to feel better, on September 18, 2014, Moore went back to Hart Boulevard in Klyde Warren Park with the intention of advising park management of his constitutional rights, and he hoped he could avoid an unnecessary conflict.  After arriving that day, while he and his partner were preparing to share their beliefs on Hart Boulevard, Moore was approached by Barshop again, along with Paul Frushour, the park's Event Manager, and Michael Gaffney, the Vice President of Operations for the park.

57.     They asked Moore what he was doing and he explained that he was posting a riddle.  Barshop replied that solicitation was not allowed in the park.  Continuing on, she indicated that Moore would need a permit and would have to pay a fee:  "And if you put a riddle on something, and people come by, and you go 'Hey, you want to answer this riddle?'…And, uh, so that's why we were coming over here and talking to you…Anyone who comes into this park

and brings anything in and tries to set it up is subject to pay what we call a park reservation fee."

58.     Moore did not agree that his expression amounted to solicitation, so he asked for clarification.  Barshop explained: "If you write something down – actually you've brought something into the park.  You want to set it up in such a way as to garner attention of people coming by.  And, and it's a question, so you are actually soliciting an answer from them.  It doesn't matter – you're asking them a question, because you just told me that you have a question and it eventually leads to talking about another topic.  A certain subject."

59.     Barshop equated Moore's expression with an "event" that would require a permit, maintaining: "So one of two things can happen here: Um, if you want to do this project, and you want to complete an event application, and submit it to me, and if we can do it based on what else is going on in the park, what we have going on in the park later today or whatever day you choose, I will certainly issue you an event agreement and we will allow you to stand in one position and people can walk by."

60.     Moore asked if there was a fee involved in obtaining such a permit and Barshop confirmed a high cost: "Yes there is.  It ranges from $1,500 to $5,000."

61.     In light of this high number, Moore's friend asked if the expensive permit was good for life, but Barshop replied: "No, that's one shot.  Actually it's for four hours."

62.     Barshop indicated to Moore that he needed the event permit because he brought an item into the park.  Moore noted that he regularly saw people bring all sorts of items into the park without having to obtain a permit, but Barshop added, "But they're not – they're not issuing a question to you…If there is any – if you walk up to anyone or they walked up to you, and you start talking to them about something."  Barshop went on to explain the restriction could be

COMPLAINT, page 11

based on whether another patron in the park was disturbed by the expression.

63.     Bothered by the idea that a restriction could be based on whether someone was disturbed, Moore objected to this.  Barshop was dismissive of the concern, saying: "The bottom line today is that I have to ask you to not put your question up, ask you to please leave the park if that is what your intent is, or-and if you want to be here at another time, you can fill out an application that we have online at our website and we'll see when we can get you in."

64.     Moore could not afford nor justify the exorbitant fee to speak for only four hours, but he did not want to leave either.  He had waited a long time to come back to the park.  He asked Barshop what the consequences would be if he refused to comply and she advised that she would call the police for criminal trespass.

65.     Moore did not want to get arrested.  Wanting to avoid criminal arrest, Moore thought it best to leave that day and he subsequently left.

66.     But Moore was convinced that Barshop was mistaken in her assessment of his rights.  He continued to believe he should be able to speak in that public park.  He did not think the wishes of a private management entity should interfere with his constitutionally-protected speech in a public park.

67.     Resolved more than ever to engage in protected expression on the Great Lawn and Hart Boulevard, without having to obtain a permit costing $1,500 or more, Moore was determined to exercise his constitutional freedoms the next time around.  He decided to go back to the Great Lawn area of park, and if the police were called, instead of leaving, he would wait for the police and explain his constitutional rights to them.

68.     With this goal in mind, Moore returned to Hart Boulevard in Klyde Warren Park,

set up his sketch board, and shared his message several times following his interaction with Barshop.

69.     During these visits, Moore was occasionally approached by members of the park's management, including Frushour and Gaffney.   During these interactions, park management reiterated that they considered Moore's expression an "event" that would require a permit.

70.     Though he stood his ground, Moore sought clarification from park officials about their concerns.  Frushour told Moore the sketch board itself was not the problem.  Frushour said anyone could freely paint on a sketch board in that area of the park, but once a message was put on that sketch board, it could be restricted.

71.     Park's management also informed Moore of a new "free speech" area.  The officials confirmed to Moore that all of Klyde Warren Park is a public park, but unless Moore obtained a permit for a fee between $1,500 and $5,000, he would be prohibited from engaging in his expression anywhere in the park, except for the designated "free area" in the Pearl Lawn.

72.     Moore has no interest in going to the Pearl Lawn because the area has very little foot traffic.  Whereas the Great Lawn is very well-travelled and populated, the Pearl Lawn is essentially empty and devoid of any meaningful pedestrian traffic patterns.  Because Moore wishes to engage others in conversation, a steady flow of pedestrian traffic is absolutely critical for communication of his message and the Pearl Lawn does not supply the needed flow.

73.     Convinced that he has a right to speak in open areas of the public park, Moore declined to cease his expression or leave his location in Great Lawn of Klyde Warren Park.  On these occasions, park management officials did not take any action to eject Moore from the park

and eventually left him alone.

**Moore's Expression in Great Lawn of Klyde Warren Park is Arbitrarily Restricted**

74.     Because Moore had been allowed to exercise his free speech, despite occasional interruptions from park officials, he planned to continue to go to the Great Lawn area of Klyde Warren Park and share his religious message with willing listeners.

75.     On April 30, 2015, Moore, along with a friend, went back to the Great Lawn of Klyde Warren Park for this purpose.

76.     Moore set up his portable sketch board at his usual spot, in the grassy area next to Hart Boulevard, and began to express his views to those who inquired about his riddles.  This area is particularly visible to passersby, but out of the way of pedestrian traffic, so as not to cause any congestion.

77.     A short while later, a park security guard approached Moore and demanded Moore immediately relocate to the "free zone" located in the Pearl Lawn area on the far side of the park.

78.     Moore knew that he has a constitutional right to speak in a public park in place with meaningful foot traffic and in a manner that would allow him to convey his message to others.  He declined to move and the security guard soon left.

79.     Shortly thereafter, Moore was approached by Gaffney and Frushour.  Gaffney said: "I need to ask you to move your location.  The area that you're occupying requires a permit. You're welcome to fill out that information to-to get a permit, to be here.  But until you do that, I need to ask you to relocate over by the Pearl Lawn for today."

80.     Moore's partner politely explained that they were not going to relocate.  Gaffney

responded: "So, basically you're trespassing in this location and so you're gonna leave me no choice other than to call the police.  So again, I'll ask you one last time, if you'll please politely relocate to where the area is that you guys are welcome to be and welcome to do all that you do free of charge and free of a permit."

81.    Desiring to speak in a public area of a public park without a permit, Moore and his friend politely declined to leave.  Gaffney and Frushour left.

82.    Later in the day, Sergeant Larry Litton ("Sgt. Litton") of the Dallas Police Department, along with three other Dallas police officers, approached Moore.  The sergeant acknowledged that Klyde Warren Park is a public park, but asserted that Moore's expression was prohibited in the park unless he had a permit or conducted his expression in the Pearl Lawn, remarking: "Yeah, well what you have to understand is, that they have the authority even though it is a public park, they have the authority to actually set aside an area for you to do this sort of thing, whatever it is…The situation is they have an area that's specified for that, otherwise you have to have a permit to be here."

83.    Sgt. Litton then warned Moore of the consequences for failure to comply: "The deal is we would like, we want to ask you to move to the area that they specified where you can do this without a permit.  Okay?  Otherwise you'll be considered trespassing."

84.    Sgt. Litton further explained that park's management need only ask Moore to leave in the police's presence to make Moore's conduct a violation of law: "And so they can enforce a criminal trespass, they will ask you to leave in our presence.  That's all they have to do."

85.    Seeking clarification of this, Moore asked if his only other option was getting

arrested and taken to jail if he remained in the park after being issued the trespass warning, and Sgt. Litton confirmed: "Yeah, I mean that's the option."

86.    Moore took issue with the stance, referring to his constitutional right to speak in a public park, but Sgt. Litton indicated that the park's management could force Moore to leave for any reason, even if it was just because they did not like Moore: "Well you have constitutional rights, but any organization can specify an area and say that you can't be there.  You know, that's their deal too.  You don't have to be breaking the law for that.  If someone doesn't like you…you can actually be criminal trespass on someone's property, just because they don't want you there."

87.    Gaffney interjected and warned Moore: "So like I explained earlier, we have a space for you on the east side of the park which you're welcome to just about any time.  To occupy the space you're in currently, we need you to fill out a permit request and-and send that in to us.  If you're not gonna do any of those, then I need you to leave the park, because in effect you're basically trespassing in this area because you haven't followed the proper procedures to be in the park in this location.  So those are your three options."

88.    Because he declined to leave, Sgt. Litton issued Moore a trespass warning that barred his presence from anywhere in Klyde Warren Park.

89.    The police informed Moore that the effect of the trespass warning prohibited Moore from returning to any area of Klyde Warren Park, under any circumstances, for 90 days.

90.    Fearing arrest, Moore and his friend packed up and left, and Moore has not engaged in his expression in Klyde Warren Park since.

91.    While Moore's religious conversations are prohibited from occurring on the Great

Lawn and most other locations of Klyde Warren Park, others are freely allowed to carry on conversations and engage in other forms of expression and activities in those same public areas though they similarly draw attention of others.

92.     During his visits to the Great Lawn, Moore has witnessed numerous individual and small group activities that draw attention and yet do not seemingly require a permit.

93.     On a couple of different visits, Moore saw a gentleman throwing and twirling a sword.  Some people took notice and watched his performance.  The sword twirler was able to conduct this activity in the same Great Lawn where Moore is restricted.

94.     On April 16, 2015, Moore saw and spoke with a pair of break-dancers performing in front of a small audience in the pavilion in the Great Lawn area of Klyde Warren Park.  The break-dancers had a boom box and were dancing, drawing on-lookers.  One of the break-dancers advised Moore that the park's management was aware of their activity, but allowed them to be there and engage in their dance activity without a permit, two to three times a week.

95.     On August 19, 2015, Moore saw a few people playing the guitar in the Great Lawn, attracting on-lookers.  On information and belief, these individuals did not have nor need a permit to conduct the activity.

96.     On January 31, 2016, Moore saw three different activities taking place at the same time in the Great Lawn area: a male and female performing acrobatics, a gentleman using two large sticks to make giant bubbles, and two men playing bongos.  All were performing and attracting significant attention.  On information and belief, the acrobats did not need a permit. The gentleman making bubbles was soliciting money for his performance, but he advised that he conducted his bubble activity every weekend and did not need a permit to do it.  The bongo

players were also soliciting money.  On information and belief, neither were they compelled to obtain a permit.

97.     Also, while Moore is unable to use a portable sketch board, others are free to bring similarly-sized items into Great Lawn without obtaining a permit.

**Continuing Adverse Impact on Moore's Expression**

98.     Hoping to obtain relief from the on-going impediment on his speech, Moore, through his legal counsel, sent a letter dated June 19, 2015, to Dallas Mayor Michael S. Rawlings, Chief Brown, and Warren M.S. Ernst, the City Attorney of Dallas, explaining his constitutional dilemma.

99.     The letter described Moore's interaction with Dallas police on April 30, 2015.  He stressed the unconstitutionality of the policy and practice exiling his religious expression.  The letter requested written assurance that Dallas would no longer enforce the park rules so as to ban Moore's peaceful and non-obstructive expression in wide-open, outdoor areas of Klyde Warren Park, particularly, in the Great Lawn area.

100.    In lieu of responding directly to this plea, the City referred Moore's letter to the Woodall Rodgers Park Foundation to answer on its behalf "because the Foundation is responsible for managing the Park."

101.    Foundation's counsel sent Moore a letter dated August 7, 2015, copying the addressees of Moore's letter.

102.    This letter defended the park's rules, which, they claim "regulate, as a public event, any activity, speech, or expression intended to reach an audience beyond the actors or speakers."  The letter also specifically targeted Moore's small-group expressive activity as

qualifying for restriction and defended the actions of the police in trespassing Moore out of the park. Finally, the letter confirmed that Moore would only be permitted to engage in his expression in the Pearl Lawn.

103.   Consequently, Defendants failed to offer Moore any relief from the on-going restriction. The letter indicates that the rules will remain in effect and Dallas will continue to enforce them through threat of arrest for criminal trespass.

104.   Defendants' enforcement of the restriction on Moore's expressive illustration and conversation in a wide-open, accessible area of a public park is an unjustifiable burden on Moore's constitutionally-protected expression.

105.   City of Dallas maintains a policy, practice, custom, or procedure that treats Klyde Warren Park's management as private owners of that public park, and enforcing, through threat of arrest for criminal trespass, broad restrictions on public expression in wide-open and accessible areas of a public park.

106.   As a direct consequence of this policy, practice, custom, or procedure, Moore is prohibited from engaging in public expression without the park management's permission in any area of Klyde Warren Park except the remote Pearl Lawn.

107.   This on-going restriction on Moore's religious expressive activities deters him from sharing his beliefs in the park at all, as the Pearl Lawn does not offer a sufficient audience.

108.   Moore fears arrest for expressing his message in Hart Boulevard and the Great Lawn area of Klyde Warren Park. He is chilled and deterred from returning to this area to carry on his expressive activities, severely limiting his constitutionally-protected expression in open areas of a public park. If not for Defendants' enforcement of the restrictions on Moore's

COMPLAINT, page 19

expression, Moore would return to Klyde Warren Park and share his religious message.

109.     The chill and deterrence on the exercise of Moore's constitutional rights in a public park constitutes irreparable harm to Moore.

110.     There is no adequate remedy at law for the loss of Moore's constitutional rights.

## FIRST CAUSE OF ACTION

### Violation of Freedom of Speech

111.     Moore re-alleges and incorporates herein by reference all preceding paragraphs.

112.     Moore's religious expressive activities constitute protected speech under the First Amendment.

113.     Defendants' policies, practices, customs, and procedures, and the enforcement thereof, including, but not limited to issuing criminal trespass warnings to individuals engaged in protected expression on the basis of park rules broadly restricting speech in a public park:

a.     are vague and overbroad;

b.     restrain constitutionally-protected speech in advance of its expression, without appropriate guidelines or standards to guide the discretion of officials charged with enforcing the policy;

c.     chill the free speech and free exercise of religion of Moore and third-party citizens;

d.     allow for the exercise of unbridled discretion;

e.     create a content-based heckler's veto that silences Moore's expression due to hostile audiences;

f.      lack narrow tailoring, fail to achieve any legitimate government purpose, and fail to leave open alternative avenues for expression; and

g.      are unreasonable.

114.    Defendants have no compelling or legitimate reason that can justify their censorship of the religious views that Moore seeks to communicate in open areas of a public park.

115.    Defendants' policies, practices, customs, and procedures, and their enforcement therefore violate the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

WHEREFORE, Moore respectfully prays the Court grant the equitable and legal relief set forth in the prayer for relief.

## SECOND CAUSE OF ACTION

### Violation of Due Process

116.    Moore re-alleges and incorporates herein by reference all preceding paragraphs.

117.    Defendants' policies, practices, customs, and procedures which are the subject matter of this case are vague and lack sufficient objective standards to restrain the discretion of city officials.  This gives Defendants ample opportunity to enforce the policies in an *ad hoc*, arbitrary, and discriminatory manner.

118.    As a result of these vague restrictions and Defendants' enforcement thereof, Moore has been deprived of his fundamental right to due process of law in violation of the Fourteenth Amendment to the U.S. Constitution.

119.    Defendants have no compelling or legitimate reason that can justify these vague

policies, practices, customs, and procedures.

WHEREFORE, Moore respectfully prays the Court grant the equitable and legal relief set forth in the prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Moore respectfully prays for relief in that this Court:

A.     Assume jurisdiction over this action;

B.     Enter a judgment and decree declaring that the actions taken by Defendants in preventing Moore from sharing and illustrating his views on a small portable sketch board and conversing with others on the Ginsburg Family Great Lawn and Hart Boulevard in Klyde Warren Park in downtown Dallas, Texas on April 30, 2015, violated Moore's constitutional rights, namely, his rights to free speech and due process;

C.     Enter a judgment and decree declaring that Defendants' policies, practices, customs, and procedures of enforcing, through criminal trespass processes, a park rule that mandates a permit and exorbitant fee for individual and small group expression taking place in a public park, is unconstitutional on its face and as applied to Moore's religious expression, because it violates Moore's rights and the rights of third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

D.     Enter a judgment and decree declaring that Defendants' restriction imposed on Moore's religious illustration and conversation in a public park is unconstitutional on its face and as applied to Moore's religious expression because it violates Moore's rights and the rights of third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

COMPLAINT, page 22

E.      Enter a preliminary and permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from applying Defendants' policies, practices, customs, and procedures that bans unlicensed individual and small-group speech in publically-accessible areas of a public park so as to abridge the free expression of ideas therein;

F.      Enter a preliminary and permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from enforcing the park rule banning unlicensed individual and small-group expression as an "event" so as to restrict constitutionally-protected speech of speakers, including Moore and other third parties, on the Ginsburg Family Great Lawn in Klyde Warren Park in downtown Dallas;

G.      Adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment;

H.      Award Moore nominal damages in the amount of $1.00 arising from the acts of the Defendants as an important vindication of his constitutional rights;

I.      Award Moore his costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

J.      Grant such other and further relief as appears to this Court to be equitable and just.

Respectfully submitted,

| | |
|---|---|
| s/Nathan W. Kellum<br>Nathan W. Kellum*<br>TN BAR #13482; MS BAR #8813<br>CENTER FOR RELIGIOUS EXPRESSION<br>699 Oakleaf Office Lane, Suite 107<br>Memphis, TN  38117<br>(901) 684-5485 telephone<br>(901) 684-5499 fax<br>nkellum@crelaw.org<br><br>Philip E. Mischke*<br>TN BAR #010063<br>Farris Bobango Branan PLC<br>999 S. Shady Grove Road, Suite 500<br>Memphis, Tennessee 38120<br>(901) 259-7213 (voice)<br>(901) 259-7150 (fax)<br>pmischke@farris-law.com<br><br>Attorneys for Plaintiff Ricky Moore<br>*Applications for Admission *pro hac vice* filed concurrently | James A. Pikl<br>Texas Bar No. 16008850<br>Scheef & Stone, LLP<br>2600 Network Blvd., Suite 400<br>Frisco, Texas 75034<br>(214) 472-2100<br>Fax (214) 472-2150<br>jim.pikl@solidcounsel.com<br><br><br><br><br><br><br><br><br><br><br><br><br>Attorney for Plaintiff Ricky Moore |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 6, 2016, the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, and that a copy of the foregoing has been/will be delivered to a process server for service on defendants.

s/Nathan W. Kellum
Attorney for Plaintiff

COMPLAINT, page 24

## VERIFICATION OF COMPLAINT

I, Ricky Moore, a citizen of the United States and a resident of Cedar Hill, Texas, hereby declare that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged therein are true and correct.

RICKY MOORE